Estate of Harry B. Signor, Deceased, First Trust and Savings Bank of Pasadena and T. W. Smith, Executors v. Commissioner.
Estate of Harry B. Signor v. Commissioner
Docket No. 8559.
United States Tax Court
1947 Tax Ct. Memo LEXIS 84; 6 T.C.M. (CCH) 1059; T.C.M. (RIA) 47258; September 30, 1947
*84 On the record it is held that an inter vivos gift made by decedent of a substantial part of his estate to his wife 28 days before his death was made in contemplation of death within the purview of section 811 (c) of the Internal Revenue Code. John W. Holmes, Esq., 300 First Tr. Bldg., Pasadena 1, Calif., for the petitioner. H. A. Melville, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent has determined an estate tax deficiency of $11,214.45 against the Estate of Harry B. Signor, who died January 11, 1943, a resident of Pasadena, California. Certain of the issues were settled by stipulation, leaving for decision here only the one issue as to whether or not *85 an inter vivos gift made by the decedent to his wife 28 days before his death was made in contemplation of death within the purview of section 811 (c) of the Internal Revenue Code. Findings of Fact The decedent, Harry B. Signor, was born September 27, 1870 and died January 11, 1943, at the age of 72 years. At the time of his death he was a resident of Pasadena, California, and the estate tax return was filed by his executors with the collector of internal revenue at Los Angeles, California. The decedent had formerly been a securities broker in Chicago, Illinois. He retired in April 1939 and, with his wife, Carlotta S. Signor, moved to Pasadena, California. Decedent's wife, Carlotta, died in Pasadena on November 12, 1939. Soon after the death of his wife the decedent executed a new will making a number of specific bequests, one of which was in the amount of $10,000 to one Evelyn Zuber, then living in Chicago. The decedent and his wife had known Evelyn Zuber since she was a small girl and at one time had discussed adopting her as their daughter. They were both very found of her and had taken her on extended trips and after she grew to womanhood had assisted *86 her financially. After the death of his wife the decedent became very much depressed. He corresponded with Evelyn Zuber and, at his suggestion and expense, she came to visit him in Pasadena in June 1940 and stayed approximately 2 1/2 weeks. Upon her return to Chicago they continued to correspond and finally at decedent's request she returned on January 28, 1941 to Pasadena to make her home permanently with the decedent. During her visit to decedent in 1940, Evelyn Zuber had been told by him that if she would return to live with and take care of him he would make provision for her in his will. At the time Evelyn Zuber went from Chicago to Pasadena to permanently reside with the decedent she resigned the position of "space buyer" which she held with an advertising firm at a salary of $160 a month. Decedent employed a housekeeper in his home in Pasadena who did the cooking and performed the household duties. Evelyn did no work but merely acted as a companion to the decedent. She was given no salary or regular allowance but the decedent opened an account for her at a Pasadena store in order that she might buy the clothes she needed and also arranged for her to use his charge accounts *87 at other stores. From time to time he gave her such money as she needed. The decedent was in the habit of discussing his financial affairs with the president of his bank in Pasadena and in 1941, after Evelyn came to live with him, he discussed with his banker the question of the purchase of an annuity for Evelyn which would produce an income of approximately $200 a month. After the cost of this was ascertained and found to be excessive because of Evelyn's age, that plan was abandoned and a plan of making an outright gift to her of securities was adopted. At the time of the death of decedent's wife, Carlotta, she had three married sisters living in Pasadena. Very friendly relations existed between the decedent and these sisters and their husbands. In the will made by decedent shortly after Carlotta's death bequests were made to these sisters and their husbands. The husbands of two of these sisters were designated executors of this will. Shortly after Evelyn came to Pasadena to make her home with decedent friction developed between these relatives of Carlotta and decedent. They resented Evelyn's presence in the decedent's home and their attitude toward her was such that the decedent *88 became very resentful and executed a new will in which the amounts left the sisters were greatly reduced and the bequest to Evelyn was increased from $10,000 to 50 1/2 per cent of his estate. On December 2, 1941, less than six months after executing this will, decedent executed a new will in which Evelyn was left 54 1/2 per cent of his estate and his sisters-in-law were left nothing. The decedent married Evelyn in April 1942. He was at that time 72 and she was 42 years of age. Shortly thereafter, on May 11, 1942, decedent executed a new will in which 59 per cent of his estate was left to his wife, Evelyn Zuber Signor. Decedent's father had lived to be 91 years of age and decedent often stated his belief that he would himself live to such an age. He was a rather small man, five feet, four or five inches in height. After his retirement and his move to Pasadena decedent's activities consisted of looking after his lawn and garden, with the assistance of a gardener one-half day each week, and doing the marketing. He drove his car and went to movies and concerts. Decedent was a Christian Scientist and, as such, never employed the services of a physician. Christian Scientists when suffering *89 from any physical ailment try not to show it and do not speak of it. The decedent never complained of feeling bad. He carried no life insurance because early in his life his application for insurance had been denied on account of the presence of albumin in his urine. In 1939, just before moving to Pasadena, he had on one occasion suffered what he termed a "stroke" and had to be sent home in a car and nursed for several days. After the death of his first wife, Carlotta, and during 1940 and 1941, it was noted that he experienced at times some difficulty in walking and took short steps and went very slowly. It was also noted that he no longer carried himself erect but was rather stooped. On the evening of Thanksgiving Day 1942 while the decedent and Evelyn and their housekeeper were playing cards, the two latter noticed that decedent had become very flushed in the face but when asked by them if he was feeling all right he replied that he was. On December 14, 1942, the decedent transferred to Evelyn by gift securities having a value as of that date of approximately $43,000. This was done after full discussion of the matter with his banker as to the effect the gift would have on his income *90 tax and the estate tax payable on his death. The change which would be effected by the gift in income and estate tax was computed by the banker and the figures submitted to decedent. On January 8, 1943, decedent did some work around his garden. No change was noted in his appearance and, after returning to the house in the afternoon from the garden, he and his wife did the marketing as they were expecting dinner guests the following day. Just before 6:00 p.m. the decedent complained of a severe pain in his back and Evelyn called a Miss Putnam, a Christian Science practitioner whom the decedent had for some time employed on a regular retainer to give him absent treatments for constipation. This practitioner advised that she would give him an absent treatment for the pain he was feeling. However, the pain increased and the practitioner was again called at 9:00 p.m. and 11:00 p.m. and at 1:00 a.m. Finally, between 3:00 a.m. and 4:00 a.m., the pain became so intense that the practitioner was again called, when she advised that a medical doctor be called in. When this doctor arrived he examined the decedent and immediately had him taken to a hospital where he was given a blood transfusion *91 to which he did not respond. Two days later, on January 11, 1943, the decedent died. The hospital records covering the examination of the decedent state that upon his arrival at the hospital there was a rather large, quite hard mass in the upper abdomen which by exerting pressure had displaced the right kidney. An autopsy revealed that the immediate cause of death was the rupture of an abdominal aneurysm, right renal artery and abdominal aorta. Permission was not given for an autopsy upon decedent's head or neck, but the report of the autopsy upon the body lists 18 different signs of physical ailments or disorders. The inter vivos gift by decedent of securities to his wife on December 14, 1942 was in contemplation of death within the purview of section 811 (c) of the Internal Revenue Code. Opinion The question presented is one of fact to be determined upon the record evidence. Decisions by the courts in other cases are of little help except to the extent that they define what the term "contemplation of death" means as used in the statute. The rule is clear that by "contemplation of death" there is not meant the general expectation of death which all *92 entertain, but a particular concern giving rise to a definite motive. The statute is designed to embrace those inter vivos conveyances which are, in fact, in the nature of testamentary dispositions. United States v. Wells, 283 U.S. 102; Allen v. Trust Company of Georgia, 326 U.S. 630. Here there are many circumstances and conditions which, standing alone, might have been insufficient to base a finding that the transfer was one in contemplation of death. When taken together, however, we think that the conclusion that the transfer was of such character is inescapable. The transfer was made less than a month before the death of the decedent and was of a material part of his estate. The donee of the gift was his wife, the natural beneficiary under his will. In fact, the decedent only a few days prior to making the gift, had executed a new will providing that his wife receive 59 per cent of his entire estate. The gift was made only after consultation between the decedent and his banker as to the effect that such a gift would have upon the estate tax payable at his death. In fact figures depicting the effect of such a gift on his estate tax were prepared for *93 and submitted to him by his banker. It is quite evident that at the time of the gift decedent's state of health was such that he might die at any moment. We are not impressed by the testimony that decedent was in good spirits and gave no evidence of any thought on his part that death was imminent. Decedent was a Christian Scientist and the evidence convinces us that his attitude would have been the same even had he realized his physical condition and known that death was near at hand. Moreover, there is much evidence which tends to show that the decedent must necessarily have known that his physical condition was very bad indeed. The hospital records include a statement that he had been suffering from shortness of breath. Other testimony is that he had broken perceptibly, walked slowly and with short steps, and no longer carried himself erect. Only a few weeks prior to making the gift in question decedent had some seizure while playing cards which his wife stated she thought might have been a stroke. Considering all these facts and circumstances, we are driven to the conclusion that the presumption that the gift by decedent to his wife 28 days prior to his death was one made in *94 contemplation of death within the purview of section 811 (c) has not been overcome and that such facts establish affirmatively, in our opinion, that such transfer was one in contemplation of death. Effect will be given to the stipulation of the parties upon the other issues raised in the petition. Decision will be entered under Rule 50.